UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JOSEPH J. ROTH-BRADLEY, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:25-CV-388 DRL-SJF |
| ALEJANDRO DAVILLA *et al.*, | |
| Defendants. | |

OPINION AND ORDER

Joseph L. Roth-Bradley, a prisoner without a lawyer, moves for a preliminary injunction requiring prison medical staff to provide him with suboxone to manage his opioid use disorder (OUD). The court ordered a response from the Warden of Westville Correctional Facility, which has now been filed.

BACKGROUND

Mr. Roth-Bradley has a long-time opioid addiction and has been diagnosed with OUD, as well as depression and anxiety. (ECF 12-1 at 26-30.) He is in long-term segregation at Westville.[1] He is proceeding on the following claims: (1) an Eighth Amendment claim for damages against Lieutenant Alejandro Davilla for deliberate indifference to his need for medical assistance when he was experiencing withdrawal

---

[1] A record indicates Mr. Roth-Bradley is in long-term segregation for weapons offenses and "staff assaults," and is due to be released sometime in July 2025. (ECF 12-1 at 18.)

symptoms; and (2) an Eighth Amendment claim for injunctive relief against the Warden related to his ongoing need for treatment to manage his OUD.[2] (ECF 4.)

The Warden has submitted medical records and other documents in response to the motion. (ECF 12.) These records reflect that in April 2024, Mr. Roth-Bradley was approved for and began participating in a medically assisted treatment (MAT) program at Westville, through which he received suboxone daily to manage his addiction. (ECF 12-1 at 1-3.) As part of the MAT program, he had to agree to certain terms, including refraining from illicit drugs. (*Id.* at 3.) In June 2024, he was temporarily transferred to another facility for a court hearing. (*Id.* at 6.) Because that facility had no suboxone protocol, Westville staff called and arranged for an exception, and the medication was sent with him and administered as prescribed. (*Id*. at 6-7.)

On October 22, 2024, there was a problem with the administration of medications at Westville due to a nurse not showing up for work. (ECF 12-2 at 1.) As a result, there was a delay in Mr. Roth-Bradley receiving his suboxone. (*Id.*) Around 1:45 p.m., Lt. Davilla was notified that Mr. Roth-Bradley had the window to his cell covered and was refusing to speak to staff. (*Id.*) Lt. Davilla and two other officers knocked on his door, with no response. (*Id.*) The officers attempted to talk to him through the "cuff port," a slot in the door through which inmates can receive food trays and other items, but Mr. Roth-Bradley immediately stuck his hand through the cuff port and refused orders to remove it. (*Id.*) Lt. Davilla asked him what the problem was, and Mr. Roth-Bradley began

---

[2] A portion of his preliminary injunction motion relates to a claim he raised under the Americans with Disabilities Act, but this claim was dismissed at screening. (*See* ECF 4.)

shouting that he was withdrawing from suboxone. (*Id.*) Lt. Davilla explained to him that he would receive his suboxone at the next medication pass in about 45 minutes, but Mr. Roth-Bradley shouted obscenities at him. (*Id.*) Because Mr. Roth-Bradley still had his hand in the cuff port, Lt. Davilla unholstered his TASER (without deploying it) and gave him an additional order to remove his hand. (*Id.*) Mr. Roth-Bradley then removed his hand and yelled, "[Y]ou'll be back to give me my drugs bitch!" (*Id.*) After this incident, Mr. Roth-Bradley was charged with a disciplinary infraction for disrupting security. (*Id.*)

As a result of this incident, Dr. Jackson (a non-party), made the decision to terminate Mr. Roth-Bradley's suboxone prescription. (ECF 12-1 at 8.) However, Mr. Roth-Bradley continued to be monitored by mental health staff and to receive medication and other treatment for his addiction and mental health problems. Between October 2024 and June 2025, he was seen by medical and mental healthcare professionals at least 30 times for evaluations and/or assessments related to his mental health and addiction problems. (*Id.* at 9-23, 26-31, 36-38, 43-46, 57-60.) In an assessment conducted by a mental health provider a few days after the incident with the cuff port, Mr. Roth-Bradley acknowledged that he had been using illicit drugs at the prison. (*Id.* at 9.) She discussed with him the importance of "allowing his body to detox." (*Id.*) She referred him to the prison's Addiction Recovery Services (ARS) program, and he has had meetings with program staff to discuss his needs and coping strategies for controlling his addiction. (*Id.* at 10, 17-18.)

Mr. Roth-Bradley is also under the care of psychiatrists. In December 2024, a psychiatrist met with him and made the following observations:

> Fair spirits but said has been anxious re mom's [cancer diagnosis]. Not overwhelmed, hopeless or helpless. No panic. No anergia, anhedonia. No issues w[ith] sleep, appetite, focus. Positive, hopeful and future-oriented. No anticipated problems from upcoming holiday season - said birthday is on 27th Enjoys regular MH meetings - discussed venting, support. Said awaiting review by MAT to resume [suboxone]; explained circumstances of [suboxone discontinuation] Cymbalta helped but had side effects; no side effects [with] Effexor. Good compliance. No staff report of misuse. No activation, mood dysregulation, irritability or other hypomanic/manic symptoms. No delusions, odd thoughts or perceptual symptoms No somatic symptoms reported . . . No persistent, recurrent depression. No psychosis, mania, panic, PTSD symptoms reported[.]

(*Id.* at 18-20.) The psychiatrist renewed his Effexor but did not order any other medications. (*Id.*) That same month he had a counseling session with a mental health provider. (*Id.* at 17.) They discussed his concerns, including his desire to be put back on suboxone, as well as coping strategies for refraining from substance abuse. (*Id.*) She found him to be functioning within normal limits and noted, "Patient [within normal limits]. No concerns observed by writer during encounter." (*Id.*)

In April 2025, he was evaluated by a different psychiatrist, who made the following notes:

> Patient reports that he is not doing well. He feels as though others are "messing" with him and things are "not cool" [in restrictive housing]. He said that he is supposed to be in the MAT program, but it was discontinued due to difficulties that he had with staff on site. He told me that he is not getting his medication consistently. His mood was "bad". . . . He is also using substances on a regular basis. He said that he is smoking what he thinks is Spice daily. We discussed how a lot of factors most likely contribute to his feelings of wanting to harm others, but using substances was going to have a significant effect on that as well. I also discussed with him the effects of using substances while he is on his medication and the risks to his physical health with continuing to do so. He also told me that his mother was recently diagnosed with cancer, which has been difficult for him. He denied [auditory/verbal hallucinations]. He denied paranoia. I

4

>  discussed with him keeping his medication the same given his substance use. He was agreeable with this plan.

(*Id.* at 26.) The psychiatrist renewed his Effexor but did not prescribe any other medications. (*Id.* at 26-31.)

During an appointment with a mental health provider on May 1, 2025, Mr. Roth-Bradley reported to her that he "started using substances again." (*Id.* at 39.) On May 16, 2025, he was found unresponsive in his cell. (*Id.* at 43.) He was taken to the medical unit, where he regained consciousness and told staff that he had "was smoking something and threw up and fainted." (*Id.*) He was given Narcan and placed on 24-hour observation. (*Id.*) He received another conduct report as a result of this incident. (ECF 12-3 at 2.)

After this incident he was evaluated by the ARS Facility Director. (ECF 12-1 at 44.) She decided to place him on a list "to complete a clinical substance use assessment and/or staffed with [Multidisciplinary Team] to determine whether further assessment or updates to treatment are clinically indicated." (*Id.*) She also counseled him on coping skills to refrain from substances use and provided guidance on how he could obtain additional support and resources from ARS as needed. (*Id.*)

## ANALYSIS

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

5

that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotations omitted). In assessing the merits, the court does not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, the court must make an assessment of the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, the court's ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012)

(citation and quotations omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in correctional setting).

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove a violation of this right, a prisoner must show (1) he had an objectively serious medical need and (2) the defendant acted with deliberate indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

On the second prong, deliberate indifference represents a high standard. "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to prove an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Instead, the inmate must demonstrate "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible," *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. The court must "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and quotations omitted). In effect, the Eighth Amendment protects prisoners

from "grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019).

Mr. Roth-Bradley has shown that he has a serious medical need in connection with his OUD and other mental health problems. On the second prong, the present record does not show deliberate indifference. Instead, it reflects that medical staff have been attentive to his needs and provided him with evaluations, medication, counseling sessions, substance abuse resources, and other treatment modalities to address his issues. When he was taking suboxone, Westville staff made efforts to ensure he continued to receive the medication even though he was temporarily transferred to another correctional facility. His suboxone was later terminated by a medical doctor after the incident in which he engaged in misconduct after experiencing a brief delay in his receipt of the medication. Had he cooperated with staff, he would have received the suboxone in less than an hour. Although it appears he suffered some unpleasant symptoms as a result of withdrawing from suboxone, the symptoms appear to have been temporary, and more recent records reflect that he did not suffer any long-term ill effects.

He is currently under the care of psychiatrists, who have prescribed him medication, but not suboxone. It is clear that he wants to be placed back on suboxone, but the Eighth Amendment does not entitle him to demand specific medication. *Walker*, 940 F.3d at 965. His providers have determined that suboxone is not indicated and that he should be treated through other means, in part because he has been using illicit drugs at the prison. Their professional opinion is entitled to deference in this proceeding. *Walker*, 940 F.3d at 965. His own subjective assessment of his medical needs or disagreement with

his providers does not establish an Eighth Amendment violation. *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019).

Based on this record, Mr. Roth-Bradley has not demonstrated a likelihood of success in proving that staff are acting with deliberate indifference to his medical needs, or that he will suffer irreparable injury if he is not granted emergency injunctive relief before this case is resolved. He is not entitled to the extraordinary remedy of a preliminary injunction.

For these reasons, the plaintiff's motion for a preliminary injunction (ECF 2) is DENIED.

SO ORDERED.

July 21, 2025                                                          *s/ Damon R. Leichty*
                                                                                    Judge, United States District Court